HUDSON RIVER SLOOP CLEARWATER, INC., the Sierra Club, Inc., Friends of the Earth, Inc., American Littoral Society, Inc., Physicians for Social Responsibility/NYC, Inc., New York Public Interest Research Group, Inc., Miriam Friedlander, Member of the New York City Council, Ruth W. Messinger, Member of the New York City Council, Carol Greitzer, Member of the New York City Council, Julia Harrison, Member of the New York City Council, Arthur Katzman, Member of the New York City Council, Carolyn B. Maloney, Member of the New York City Council, Stanley E. Michels, Member of the New York City Council, Dr. E. Thomas Henkel, Robert McAndrew and John Warlock, Plaintiffs–Appellants,

v.

DEPARTMENT OF the NAVY, John F. Lehman, Jr., as Secretary of the Department of the Navy, Everette Pyatt, as Assistant Secretary of the Department of the Navy, Admiral Carlisle A.H. Trost, as Chief of Naval Operations, Department of Defense, Casper W. Weinberger, as Secretary of the Department of Defense and Chapman B. Cox, as Assistant Secretary of the Department of Defense, Defendants–Appellees.

No. 1682, Docket 87–6185.

United States Court of Appeals, Second Circuit.

Argued Aug. 12, 1987.

Decided Jan. 8, 1988.

Leonard M. Marks, New York City (Gold, Farrell & Marks, New York City, Allan R. Friedman, Thomas R. McCaffrey, Vicki F. Van Fleet, of counsel), for plaintiffs-appellants.

Robin L. Greenwald, Brooklyn, N.Y., Asst. U.S. Atty. for the Eastern District of New York (Andrew J. Maloney, U.S. Atty. for the Eastern District of New York, Peter R. Ginsberg, Asst. U.S. Atty., New York City, of counsel), for defendants-appellees.

Before WINTER and MAHONEY, Circuit Judges, and RE\*, Chief Judge, Court of International Trade.

PER CURIAM:

Plaintiffs-appellants, Hudson River Sloop Clearwater, Inc., et al. (collectively "Hudson"), bring this expedited appeal from an order of the United States District Court for the Eastern District of New York, Charles P. Sifton, Judge, entered July 16, 1987 which denied their motion for a preliminary injunction prohibiting dredging and pier construction by the United States Navy (the "Navy") with respect to the proposed Staten Island homeport for the U.S.S. Iowa Battleship Surface Action Group (the "Iowa SAG") pending compliance with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq. (1982 & Supp. III 1985). On appeal, as in the district court, Hudson seeks to enjoin dredging and pier construction for the homeport, despite the Navy's compliance with NEPA for this aspect of the project, until the Navy has complied with NEPA in its extended plans for housing for homeport personnel and their families. The district court found that the plaintiffs showed "a substantial likelihood of success on their

\* The Honorable Edward D. Re, Chief Judge, Court of International Trade, sitting by designa- tion.

claim that NEPA required a discussion of both actions in a single [environmental impact statement]," but in assessing the competing claims of injury, determined that the independent utility of the homeport, together with the absence of any allegation that work on the operational aspects of the homeport would result in irreparable environmental harm, called for denial of the motion for a preliminary injunction.

In 1982, the Navy determined that it was strategically necessary to disperse its previously concentrated fleet to a greater number of locations around the country in order to limit its vulnerability. In October, 1983, the Navy selected Stapleton and Fort Wadsworth, both in Staten Island, New York City, as the homeport for the Iowa SAG. The Stapleton site was designated as the berth for the U.S.S. Iowa and her six supporting ships, while the Fort Wadsworth site, an army installation about 1¼ miles from Stapleton, was intended to house the homeport's administrative offices, as well as barracks for enlisted personnel, recreational facilities and medical clinics, in a combination of existing facilities and new construction. Married personnel were envisioned as finding affordable housing in the private housing market.

This plan was outlined in the Navy's initial environmental impact statement ("EIS") issued late in 1984 and, after a public comment period, reissued in early 1985 first as a final EIS and subsequently as a Record of Decision ("ROD"). Later in 1985, the Navy reassessed its plans and issued a draft supplemental EIS that addressed several proposed changes in the homeport scheme, including housing for married homeport personnel. The new alternatives under consideration in the draft supplemental EIS were military construction housing (built, owned and operated by the Navy) and Section 801 housing (leased from a private developer though built to Navy specifications; see 10 U.S.C. § 2828 (1982 & Supp. IV 1986)). The environmental impact of the housing was considered with respect to the sites it would occupy. The final supplemental EIS designated a combination of 1,150 units of Section 801 housing at South Beach, Staten Island and 550 units of military construction housing at Fort Wadsworth.

Subsequently, the Navy was advised by the New York State Department of Environmental Conservation that much of the South Beach site constituted protected wetlands subject to state regulation. The Navy issued an ROD for the homeport in August, 1986 reducing the projected South Beach housing to 800 units (with the difference to be handled by the private market), and promising not to build within 100 feet of the wetlands. In accordance with a district court memorandum and order dated April 28, 1987, the Navy disclosed on May 7, 1987 its most recent intention to issue a request for proposal for private developers to provide up to 1,000 units of Section 801 housing in the area, "a portion of which may or may not be built at South Beach." The Navy anticipates that the award of a proposal for the Section 801 housing will occur some time in 1988. Funding for the Fort Wadsworth housing units has not yet been approved by Congress.

The overseer of the Navy's housing proposals, Rear Admiral Benjamin F. Montoya, testified before the district court that although the Navy was very concerned about the existence of adequate housing for its married homeport personnel as a morale consideration, strategic planning requires that the operational aspects of the homeport be constructed whether the housing is ultimately feasible or not. He indicated that nationwide there are several homeports with inadequate or no housing for married personnel, and that this situation was often unavoidable. The Navy, he said, was prepared to house its personnel in barracks or on the ships if necessary, but would not consider moving the homeport.

In the meantime, dredging and pier construction have begun at the Stapleton site. It was estimated that by the end of 1987, approximately twenty million dollars would have been spent on the project.

Hudson seeks on appeal, as it did below, to enjoin further dredging and pier construction with respect to the homeport until the Navy has fully developed a housing

plan that comports with NEPA. Hudson claims that the two aspects of the homeport are connected actions under the regulations of the Council on Environmental Quality ("CEQ"), and have been improperly segmented for NEPA evaluation.

In order to obtain a preliminary injunction in this circuit, the moving party must establish "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir.1987) (per curiam); *Stormy Clime Ltd. v. Progroup Inc.*, 809 F.2d 971, 973 (2d Cir.1987); *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1141 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987).

The district court found that:

[S]ince family housing construction and the operational aspects of the homeport are connected actions within the meaning of the CEQ regulations and case law, and environmental review of the foreseeable impacts of such housing is meaningfully possible at this time, the Court finds that plaintiffs have shown a substantial likelihood of success on their claim that NEPA requires discussion of both actions in a single EIS.

The district court denied the injunction, however, in view of the "independent utility of the project, as well as the absence of any allegation that work on the operational facets itself will cause irreparable environmental harm in violation of NEPA...."

We affirm the denial of the preliminary injunction on the ground that there has been no showing of a reasonable likelihood of success, or of "sufficiently serious" questions, on the merits of the claim, to wit, that NEPA requires a discussion of both actions in a single EIS. We note in this regard that we may affirm the district court's decision on any ground for which there is a record sufficient to permit conclusions of law, even though reliance was not placed upon that ground below. *Alfa-*

*ro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir.1987), and cases there cited.

NEPA requires an EIS for any major federal action that will significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C) (1982). In addition, the Council on Environmental Quality has issued regulations that determine when actions are considered "[c]onnected, ... which means that they are closely related and should be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1) (1987). The regulation specifies this category in the following terms:

(1) Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

*Id.*

■ Only subdivisions (ii) and (iii) are at issue here. With respect to subdivision (ii), the district court concluded that the actions in this case are connected because the "construction of the family housing will not proceed unless the operational aspects of the homeport are built." We deem the issue presented, however, to be whether the converse is true. In other words, will the operational aspects of the homeport proceed without the construction of family housing? *Compare Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir.1985) (actions are connected under subdivision (ii) where timber sales cannot proceed without road *and* road would not be built but for contemplated timber sales). The district court explicitly found that "[e]ven if the Navy is unable to provide any family housing, ... military necessity requires it to proceed with the project." Given this finding, it is inappropriate for the housing and the operational aspects of the homeport to be deemed "connected" under subdivision (ii).

■ The district court also concluded that the Navy's inclusion of housing in its final supplemental EIS shows that it con-

sidered the housing to be an interdependent part of the larger homeport concept, and the housing and the operational aspects of the homeport are accordingly connected actions under subdivision (iii). That the Navy may have done more than was necessary to comply with the regulation, however, is no reason to enlarge the regulatory requirements. In fact, subdivision (iii) has been determined to mirror a line of cases which hold that the proper test for interdependence is one of independent utility. *Fritiofson v. Alexander,* 772 F.2d 1225, 1242 (5th Cir.1985). *See, e.g., Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294 (D.C.Cir.1987) (four-mile rail system with independent utility from rail system as a whole may be considered separately); *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430 (5th Cir.1981) (highway segment determined to serve independent purpose from overall highway may be considered separately). Again, given the district court's factual finding that the Navy will proceed with the operational aspects of the homeport with or without the housing, it is clear that the two actions are not interdependent under subdivision (iii), since the operational aspect of the homeport has the requisite independent utility.

■ Since, under the case law and the CEQ regulations, the housing and operational aspects of the proposed homeport are not connected actions, they do not need to be considered in a single EIS.[1] Accordingly, Hudson has established no reasonable likelihood of success, or "sufficiently serious" questions, respecting the merits. It is therefore unnecessary to proceed any further with the test for the issuance of a preliminary injunction. The injunction was properly denied.

The order denying the plaintiffs-appellants' motion for a preliminary injunction is affirmed.

1. The Navy's ultimate housing proposal, however, will be subject to the requirements of NEPA, including an independent EIS. Hudson contends that by the time that EIS receives consideration, expenditures on the homeport project will have proceeded to a point where the project will be irreversible. Assuming *arguendo* this to be so, it will still be possible to consider and ameliorate any environmental delinquencies related to the housing aspects of the project.