IRVING BANK
CORPORATION, Petitioner,

v.

BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent,

Bank of New York Company,
Inc., Intervenor.

No. 88–1176.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 14, 1988.

Decided April 18, 1988.

Kenneth Berlin and Eloise L. Morgan, with whom Michael H. Byowitz, New York City, was on the brief for petitioner.

Richard M. Ashton, Associate Gen. Counsel, Bd. of Governors of the Federal Reserve System, with whom John R. Bolton, Asst. Atty. Gen., and Robert D. McGillicuddy, Atty., Bd. of Governors of the Federal Reserve System, Washington, D.C., were on the brief for respondent.

John L. Warden, with whom Richard J. Urowsky, Washington, D.C., was on the brief for intervenor, The Bank of New York Co., Inc.

Before WALD, Chief Judge, and ROBINSON and STARR, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

This appeal involves the legality of the Board of Governors of the Federal Reserve

System's conditional approval of The Bank of New York Company, Inc.'s (BNY) application first to acquire, then to merge with, Irving Bank Corporation (Irving). *See* Joint Appendix (J.A.) at 1–60 (Board Order). Because we decide that substantial evidence supports the Board's determination that the acquisition complies with the Bank Holding Company Act of 1956, as amended, 12 U.S.C. § 1841 *et seq.*, we uphold the Board Order.

## I. BACKGROUND AND STANDING

### A. *Facts*

On September 23, 1987, respondent–BNY, a bank holding company, approached petitioner–Irving with a merger proposal. Irving refused,[1] and on September 25, 1987, BNY made a direct offer to purchase all of Irving's voting shares. A Registration Statement to this effect, subsequently twice amended, was filed with the Securities and Exchange Commission.

Over Irving's opposition, the New York State Banking Board unanimously approved BNY's state application for approval of the acquisition. On October 2, 1987, BNY sent a similar application to the Board of Governors of the Federal Reserve System (Board), pursuant to sections 3 and 4 of the Bank Holding Company Act (BHCA or the Act). 12 U.S.C. §§ 1842, 1843. The application to the Board was revised on November 4, 1987. Lengthy investigations and administrative proceedings followed, and on February 25, 1988, the Board unanimously approved BNY's offer for Irving's voting shares and, alternatively, for a smaller percentage stock purchase as precursor to a proxy contest for control of Irving's Board of Directors.

The Board's thorough opinion dealt specifically with the objections raised by Irving, and explicitly conditioned approval on BNY's meeting several financial conditions. The Board began by noting that the hostile nature of the proposed acquisition is of no particular relevance to its permissibility under the Act. The Board acknowledged, however, the significant adverse effects that could result from a prolonged fight, and therefore stated that it would grant BNY only one extension (for good cause) of the normal period allotted for the consummation of an approved transaction.

On the merits, the Board determined that the acquisition would have no adverse effects on competition. The Board found that the relevant market for antitrust purposes is commercial banking in the New York metropolitan and mid-Hudson geographic markets, areas in which both BNY's and Irving's subsidiary banks primarily compete. The combination of BNY and Irving would result in the fifth largest commercial banking organization in the New York metropolitan area, occupying approximately 6.9% of the market. In the mid-Hudson market the combined entity would become the largest commercial banking organization, with a 16.5% market share. The Board found that in the general commercial banking market, the transaction clearly poses no antitrust problems. Irving does not contest this determination.

The Board rejected Irving's specific argument that the relevant markets for antitrust purposes include two small, discrete services. These services, known as Government Securities Clearance (GSC) and American Depository Receipts (ADR), are offered by very few banks, two of which are Irving and BNY. Irving contended that, after the merger, these lines of commerce would be enormously concentrated, raising insurmountable antitrust concerns. In the Board's view, however, under the Supreme Court's traditional approach to defining lines of commerce in commercial banking cases, the relevant market is the *cluster* of services normally provided by banks. This view holds that the wide array of services offered by com-

---

1. Irving also adopted a Shareholder Rights Plan endowing Irving's shareholders with rights to purchase, at half price, shares in any subsequently merged company. *See* J.A. at 61–124, 2503–06. BNY contests the legality of this measure, *see infra* note 5; likewise, New York courts have before them BNY's challenge to Irving's private placement of preferred stock with a small group of investors. *See* The Bank of New York Company, Inc. v. Irving Bank Corp., Sup. Ct. N.Y.C. Index No. 02542/88.

mercial banks form one market—commercial banking. The Board held that under this approach, it is insignificant that particular services may be offered by a limited number of banks; instead, what is significant is the cluster of services that constitutes traditional banking functions. Under the contrary view, every individual service offered by banks, from specialized credit to fund transfers, could form its own line of commerce for antitrust purposes. Underlying the Board's analysis is the idea that the cluster of bank services is an economically distinct product apart from the individual services involved.

Viewed in this manner, the Board concluded that GSC and ADR services form a part of the cluster of services traditionally offered by banks. These services are performed only by commercial banks, and consist mainly of a combination of functions—such as custodial, trust, fund transfer, and credit services—commonly performed by banks. Thus, under governing Supreme Court precedent, the Board concluded that the relevant line of commerce for antitrust purposes is commercial banking, and that within this market BNY's proposed acquisition would have no adverse effect on competition.

Alternatively, the Board found that even if the relevant lines of commerce were the specialized GSC and ADR services, the transaction nonetheless would pass muster. The Board reached this conclusion notwithstanding the dramatic concentration in these "markets" resulting from a combination of BNY and Irving. In the Board's view, the anticompetitive difficulties posed by high market concentrations would be mitigated by possibilities of new entrants, customers' countervailing market power, and the availability of substitute products.[2]

The Antitrust Division of the Department of Justice approved without comment the merger proposal.

The Board also considered the financial factors involved in the acquisition. After emphasizing that "capital adequacy is an especially important factor in the analysis of bank holding company expansion proposals," J.A. at 26, the Board determined that, subject to meeting several financial conditions, BNY's capital position is sufficiently strong to warrant approval of the application.

BNY committed to achieve certain tangible common equity to assets ratios, namely 3.5% at the consummation of the merger, and 4.1% within one year of the transaction. The Board held that these ratios must be met as a condition of financial soundness; but the Board added the further condition that the amount expended on the cash portion of BNY's exchange offer ($264 million, to be raised through liquidation of $220 million in securities and issuance of $44 million of short-term debt) must likewise be replaced. BNY was thus required to support at least 60% of the cash outlay through the issuance of new equity capital, either common or noncumulative perpetual preferred stock, by the time of the transaction's consummation; the remaining 40% must be replaced in a similar fashion within six months of consummation of the transaction. Moreover, the 3.5% and 4.1% tangible common equity to assets ratios must be calculated without reference to the newly issued equity capital.

With these financial conditions, which would ensure the relatively prompt replacement of capital depleted in the transaction, the Board determined that the bank would enjoy a capital position within a short period fully in compliance with Board guide-

---

**2.** With respect to GSC services, the Board noted the fringe presence of five major New York banks which, although not actively clearing government securities for third parties, are engaged in substantial clearing operations on their own behalf. The relative ease of entry of these potential competitors was thought to mitigate the anticompetitive dangers inhering in high market concentrations. Moreover, the Board found that the relative size and sophistication of the customers for such services reduce anticom-

petitive dangers. The Board also observed that new cooperative ventures are being developed which will reduce the volume of clearing transactions, creating excess capacity and thus increased competition. Finally, the Board was of the view that barriers to entry in the GSC market are not unduly high, especially since software licensing has recently become available to provide the extremely sophisticated computer support necessary to participate in the market.

lines. Indeed, BNY's capital position in the wake of the acquisition would be better than the average of the nation's twenty largest banking organizations.

Irving objected to several aspects of the financial data relied on by the Board. Primarily, Irving contended that BNY's figures insufficiently discounted the value of Irving's nonperforming loans, principally to lesser developed countries. BNY proposed to write down to current market value certain loans it plans to sell within one year, but relied on its view of generally accepted accounting principles to leave intact the book value of Irving's remaining loans. Irving contended that this accounting treatment was incorrect, resulting in significantly overstated tangible assets (as opposed to intangible assets such as goodwill), and a corresponding understatement in the amount of capital needed to fulfill BNY's commitment to meet tangible equity to assets ratios.

The Board declined to resolve this dispute. Instead, the Board "assumed" BNY's accounting conventions in evaluating the financial soundness of the transactions. Specifically, the Board determined that it was unnecessary to decide which party was correct as to the appropriate accounting principles, because the financial conditions imposed on BNY explicitly took account of "asset quality and the uncertainties that are naturally raised" in this sort of large acquisition. J.A. at 32. Thus, the Board concluded that, subject to the financial conditions imposed, "the financial resources of BNY and the banks and companies involved are consistent with approval of the proposal." *Id.*

The Board also dealt with several asserted legal impediments to the acquisition. First, New York state corporation law precludes a shareholder who acquires more than 20% of a corporation's stock without the board of directors' approval from effecting a subsequent merger for a minimum of five years. *See* N.Y. Bus. Corp. Law § 912 (McKinney 1986). Second, Irving fashioned a Shareholder Rights Plan (a so-called "poison pill") that allows its shareholders to acquire $400.00 worth of

stock for only $200.00 in any newly merged company when the acquiring company gains more than 20% of Irving stock; depending on the outcome of pending state litigation, *see The Bank of New York Company, Inc. v. Irving Bank Corp.*, Sup.Ct.N.Y.C., Index No. 05568/88, these rights may be redeemed, however, for a nominal sum with approval by Irving's Board of Directors. *See infra* note 5.

To avoid these legal impediments, BNY sought permission to acquire up to 19.9% of Irving stock, and to conduct a proxy fight for control of Irving's Board of Directors at the shareholders' meeting scheduled for April 21, 1988. By acquiring control of the Irving Board, BNY can waive the § 912 objection and, again contingent on pending litigation, redeem the "poison pill." The Board approved BNY's proposed alternative course of action; under this approach, the Board perceived no insurmountable legal impediments to the acquisition.

The Board's remaining findings were that BNY's managerial resources are adequate to support the transaction, and that the convenience and needs of the community would be served by the acquisition. The Board denied Irving's request for a hearing, noting that no issues of fact were at stake, that the New York State Banking Board had approved the acquisition, and that Irving had been given ample opportunity to participate in the process through voluminous comments. Thus, the Board unanimously granted its approval for BNY to seek to acquire control of Irving, through acquisition of 19.9% of its stock followed by a proxy fight, as well as through an exchange offer for the bulk of outstanding Irving stock.

Irving now appeals from this decision, charging that the Board's ruling that BNY's offer complies with BHCA criteria for bank holding company acquisitions is arbitrary and capricious. By virtue of the exigent circumstances of an imminent Irving shareholders' meeting, this court expedited argument and is rendering its decision in advance of the April 21, 1988, shareholders' meeting.

## B. *Standing*

██ Irving's fiduciary duty to protect shareholders and depositors alike from the illegality and injury that Irving alleges it will suffer from the takeover attempt, along with Irving's undisputed participation in the Board proceedings, make it a "party aggrieved" under § 9 of the BHCA. 12 U.S.C. § 1848. Irving contends that the proposed acquisition will damage the financial soundness of the banks involved. As a fiduciary for its shareholders' interests, Irving therefore clearly falls within the zone of interests that Congress intended to encompass by the Act.[3] *See Investment Company Institute v. Board of Governors,* 606 F.2d 1004, 1010 (D.C.Cir.1979), *rev'd on other grounds,* 450 U.S. 46, 101 S.Ct. 973, 67 L.Ed.2d 36 (1981). The appeal is also timely, therefore Irving may properly obtain judicial review.

### II. ANALYSIS

Irving questions on appeal whether the Board's Order approving BNY's proposed acquisition of Irving respects § 3(c) of the BHCA. That section requires the Board to evaluate the effects of bank holding company acquisitions on (1) the safety and soundness of the companies involved, (2) banking industry competition, and (3) community needs. The following analysis considers the Board's findings as to these criteria.

**3.** 12 U.S.C. § 1848 reads, in part:

Any party aggrieved by an order of the Board under this chapter may obtain a review of such order in the United States Court of Appeals within any circuit wherein such party has its principal place of business, or in the Court of Appeals in the District of Columbia, by filing in the court, within thirty days after the entry of the Board's order, a petition praying that the order of the Board be set aside. *Id.*

**4.** Specifically, New York State antitakeover legislation, *see* N.Y.Bus.Corp.Law § 912 (McKinney 1986), and the "poison pill" Shareholder Purchase Rights plan adopted by Irving. *See* J.A. at 61–124, 2503–06.

**5.** Since the Board's order, Irving has revised its Shareholder Rights Plan to bar a subsequent board from redeeming stockholder share-dilution rights. *See* J.A. at 2503–06. BNY has challenged this action in a New York court. *See*

To perform this review, we are instructed by Congress that "[t]he findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive." 12 U.S.C. § 1848; *see Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 253, 99 S.Ct. 505, 515, 58 L.Ed.2d 484 (1978) (court deference to Board decision that is based on evidence in record); *North Hills Bank v. Board of Governors,* 506 F.2d 623, 625 (8th Cir.1974) (same).

As a preliminary issue, we reiterate that the Board Order contemplates two alternative methods of acquisition. *See* J.A. at 47. Had the Board approved only the tender offer aimed at acquiring a majority of Irving stock, a route which confronts weighty legal impediments,[4] we might well have hesitated because of the formidable legal barriers to a prompt merger. The Board recognized these obstacles to a majority tender offer, however, and expressly held that

BNY may decide to acquire initially no more than 19.9 percent of IBC's [Irving] voting stock and through a proxy solicitation to seek to elect at least a majority of IBC's board of directors. If BNY is successful, it would then proceed to acquire the remainder of IBC's shares.

J.A. at 2; *see also id.* at 48 n. 45.

██ Failure to consummate the merger may still occur, to be sure.[5] However,

The Bank of New York Company, Inc. v. Irving Bank Corp., Sup.Ct.N.Y.C., Index No. 05568/88. Were we to reverse the Board's order because of this possible difficulty, incumbent management could erect barriers that would always defeat a § 3(c) acquisition effort.

Irving also argues that the failure of the Board Order to address covenants contained in Irving's newly-issued preferred stock represents an abdication of the Board's responsibilities under § 3(c). We note first that Irving issued the preferred stock on February 23, 1988, over four months after BNY's application to acquire shares of Irving and only two days prior to the issuance of the Board order. The Board necessarily has some discretion over the extent to which it must consider late-submitted evidence. More importantly, we are not convinced that the preferred stock covenants pose the mortal threat to the merger Irving asserts. The Board Order in no way forecloses an attempt by BNY to convince the holders of Irving preferred stock to waive the covenants. Nor is BNY pre-

the capital adequacy conditions, as well as the Board's thorough investigations of the relevant market and of community needs, provide sufficient support for its conclusion that a merger subsequent to a directorship change in Irving satisfies the § 3(c) criteria.

## A. *Capital Adequacy*

In reviewing bank holding company acquisition proposals, the Board is required to assess the "financial and managerial resources and future prospects of the company or companies and the banks concerned...." 12 U.S.C. § 1842(c). Courts have been particularly sensitive to Board expertise in these matters. *See, e.g., First National Bancshares Corp. II v. Board of Governors*, 804 F.2d 54, 57 (6th Cir.1986).

The Board exhaustively considered the chronology and terms of BNY's proposed acquisition. *See* J.A. at 26–33. To guarantee adequate capital in the merged company, the Board conditioned its approval on BNY's meeting levels of capital that exceed regulatory and industry ratios. *See* J.A. at

30. At consummation of the transaction, the ratio of tangible common equity to assets must be at least 3.5%; a year later, the ratio must rise to 4.1%. Also BNY must issue new equity capital equivalent to the cash outlay required to purchase Irving shares. *See* J.A. at 28–29. Irving's reply that the Board failed to consider BNY's ability to comply with the conditions is unfounded.[6] The record confirms that the Board both investigated BNY's resources and evaluated the company's past success at raising equity capital.[7]

Irving contends that the Board failed adequately to set forth its reasons for settling upon the financial conditions it chose. Irving further maintains that it had inadequate opportunity to comment on the financial conditions, particularly the 3.5% tangible common equity to assets ratio. These claims are meritless. The record is replete with financial evidence on which the expert agency could rely. Moreover, Irving not only had ample opportunity to comment, it in fact commented on virtually every aspect of the proposed acquisition, including BNY's proposal to meet the 3.5% ratio at the consummation of the transaction.[8]

vented from implementing the tender offer and delaying the second-step merger for three years, when the covenants will expire. Even under this second scenario, we are confident that the Board will retain sufficient supervisory authority to avert any harmful effects this arrangement may have on the holders of Irving's preferred stock.

**6.** Irving also contends that the capital adequacy requirements are inadequate if BNY must write down Irving's loans to lesser-developed countries. Much of this argument turns on accounting adjustments. Because the Board's heightened capital adequacy safeguards expressly cover for the quality and uncertainties of Irving's assets, *see* J.A. at 32, we find that the Board's decision to "assume[ ] the purchase accounting adjustments submitted by BNY," *see* J.A. at 31, is proper.

**7.** The Board also made adequate findings that an unsuccessful proxy solicitation, leaving BNY with a minority interest in Irving, would not injure Irving's operations. *See* J.A. at 50–52. Also, the Board possesses authority to prevent the unsafe practices Irving fears that BNY-spon-

sored directors might pursue. *See* 12 U.S.C. §§ 1818, 1847(b), 3907.

**8.** Irving contends that the alleged failure adequately to explain the basis for the 3.5% ratio was particularly egregious because improper *ex parte* contacts took place between BNY and Board staff. The argument that improper *ex parte* contacts infected the proceedings is baseless. Board regulations clearly prohibit *ex parte* contacts, but only "[a]fter receipt of a substantive protest." *See* Federal Reserve System, *Processing Bank Holding Company and Merger Applications* 14, *reprinted in* Addendum C to Petitioner's Brief. Irving's formal protest was not received by the Board until December 11, 1987, by which time all informal contacts between BNY and Board personnel had ceased. According to Irving's counsel at oral argument, Irving's October 16, 1987, letter to the Reserve Bank, failed technically to comply with the requirements of a formal substantive protest because a copy was not sent to BNY. Moreover, according, to the Board's uncontested assertion in its brief, during the course of the proceedings Irving itself admitted that its October 16 letter did not constitute a substantive protest. *See* Brief of Respondent at 32.

### B. *Adverse Competitive Effect*

Sections 3(c)(1) and (2) of the BHCA require the Board to deny an acquisition proposal that will permit or further monopoly interests or whose "effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade," unless a finding is made that the community benefit outweighs such anticompetitive effect. 12 U.S.C. § 1842(c)(1) & (2).

The Board found that BNY and Irving participate in two neighboring geographic commercial banking markets, which cover the metropolitan New York–New Jersey and mid-Hudson regions. If BNY consummates its acquisition of Irving, the combined entity will control $21.8 billion in domestic deposits, and be the fifth largest commercial banking organization in New York. Largely relying on the Herfindahl–Hirschman Index (HHI) for market concentration, *cf.* 49 *Fed.Reg.* 26,823 (June 29, 1984) (Justice Department Merger Guidelines' use of HHI), the Board found that the post-merger company would not adversely affect competition in the two commercial banking geographic markets. Irving does not contest this position.

The Board separately addressed Irving's argument that a merger would cause anticompetitive effects in two discrete product markets, namely Government Securities Clearance (GSC) and American Depository Receipts (ADR) services. First, the Board made the ruling that these functions are part of a cluster of traditional banking services that cannot be disaggregated. *See United States v. Phillipsburg National Bank & Trust Co.,* 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970); *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).[9] Whether, in view of the dynamic changes in the banking industry over the past decade, discrete and highly specialized banking practices, such as those involved here, may realistically be included in a general commercial banking product market, however, is a difficult question which the time constraints of the decisionmaking process in this case simply do not allow us to probe with the necessary care. *Cf. United States v. Connecticut National Bank,* 418 U.S. 656, 662, 94 S.Ct. 2788, 2793, 41 L.Ed. 2d 1016 (1974) (*"Phillipsburg National Bank* and *Philadelphia National Bank* do not require a court to blind itself to economic realities").[10]

Therefore, we rely on the Board's second holding that the acquisition would not cause anticompetitive effects even in the separate ADR and GSC markets. The Board has unique expertise to make this inquiry;[11] this competence has traditionally been respected by courts. *See Farmers & Merchants Bank of Las Cruces v. Board of Governors,* 567 F.2d 1082, 1090 (D.C.Cir.1977) (citing cases). Substantial evidence exists to bolster the Board's determination that despite high present market concentration, hence high HHI ratings, there are several mitigating factors: some

---

**9.** These cases, however, restrict the relevant product market to commercial banking precisely to assure bank customers full antitrust protection. Courts have employed the "cluster" theory, which focuses on core banking services, primarily to distinguish commercial banks from other competitors (who lack the cost-advantage of federal insurance)—that is, to narrow the product market—not to widen the market to all commercial banks, thereby insulating monopolistic submarket behavior. *Cf. United States v. Household Finance Corp.,* 602 F.2d 1255, 1258–60 (7th Cir.1979) (using *Philadelphia* and *Phillipsburg* doctrine to find that submarket of cash loans offered by nonbank financial institutions constitutes relevant product market), *cert. denied,* 444 U.S. 1044, 100 S.Ct. 732, 62 L.Ed.2d 730 (1980).

**10.** The Board enumerates the depository and banking tasks involved in ADR and GSC operations, yet makes no effort to argue that these specialized services are "customary," or so integral to traditional banking practices that they can only be described as a single product.

**11.** Similarly, the New York State Banking Board made findings of community benefit and no adverse competitive effect when that institution approved BNY's state application for the acquisition. *See* J.A. at 2396–98.

substitutes are available,[12] competitive market entry could likely be accomplished rapidly,[13] and client strength is adequate to prevent predatory pricing. Technological and market changes in the industry add further fluidity. These assorted rationales support the Board's conclusion that there is no adverse competitive impact bar to the merger.

### C. *Community Needs*

Even were anticompetitive effect found, the Board has authority to approve a bank holding company acquisition that fulfills a community need. The Board made detailed, persuasive findings of community benefit, which address this § 3(c) priority. *See* J.A. at 38–46.

### Conclusion

Mindful that the BHCA empowers the Board to authorize financially sound acquisitions, *see Board of Governors v. First Lincolnwood Corp.*, 439 U.S. 234, 253, 99 S.Ct. 505, 515, 58 L.Ed.2d 484 (1978) (Board expertise to determine financial and competitive effects of bank holding company acquisition), we conclude that substantial evidence exists to support the Board's § 3(c) approval of BNY's acquisition.

---

**12.** The Board emphasized the custodial function that is the core of ADR services; banks and nonbank institutions can provide this role, and indeed a large number of entities offer close substitutes in the form of foreign mutual funds or direct sale of foreign shares.

**13.** Barriers to new entrants appear to be especially low in the case of GSC operations because banks that presently perform this service for themselves could presumably enlarge the practice to include customers.