IRVING BANK
CORPORATION, Plaintiff,

v.

The BANK OF NEW YORK
COMPANY, INC.,
Defendant.

No. 88 Civ. 3542 (CSH).

United States District Court,
S.D. New York.

June 2, 1988.

---

Wachtell, Lipton, Rosen & Katz, New York City (Herbert M. Wachtell, William C. Sterling, Jr., of counsel), for Irving Bank Corp.

Sullivan & Cromwell, New York City (John L. Warden, Richard J. Urowsky, Hyman L. Schaffer, Norman Feit, Daryl A. Libow, of counsel), for The Bank of New York Co., Inc.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Irving Bank Corporation ("Irving") is presently involved in a prolonged, much-publicized, adverse relationship with Defendant The Bank of New York Company, Inc. ("BNY"). That relationship arises out of BNY's effort, resisted by Irving's board to take Irving over. Irving commenced this action under the federal securities laws to compel BNY to make additional disclosures to Irving shareholders. Irving seeks preliminary injunctive relief toward that end. For the reasons which follow, I conclude that this Court, sitting in equity, should make an order at this time; and that Irving is entitled to some measure of relief.

Irving's motion came before the undersigned in Part I, during the temporary absence of Judge Lowe, to whom the case is assigned. The exigencies of the case and the press of other matters preclude a scholarly disquisition. The parties have filed able briefs. The controlling principles of law are familiar. In what follows, expedience necessarily takes precedence over art.

## BACKGROUND

In 1987 BNY determined to acquire Irving if it could. The Irving board rebuffed BNY's initial overtures. On September 25, 1987, BNY announced that it intended to acquire all outstanding shares of Irving's common stock in a tender offer and second-step merger. In October BNY applied to the Federal Reserve Board and to the New York State Banking Board for approval to acquire "up to" 100% of Irving's shares. Irving participated in the proceedings be-fore these agencies. Both agencies granted approvals to BNY in February, 1988. Irving appealed from the Federal Reserve's order of approval. The Court of Appeals for the District of Columbia circuit affirmed the Board's order. *Irving Bank Corp. v. Board of Governors of the Federal Reserve System*, 845 F.2d 1035 (D.C.Cir. 1988).

The Board's order conditioned approval on the acquisition's consummation within 90 days. The Board issued its approval order on February 25, 1988; in consequence, the 90–day period was scheduled to expire on May 25. In its order the Board noted that it would not follow "its normal procedure" if BNY sought an extension; and added that the Board would not expect to grant more than one extension.

Following the grant of regulatory approvals, BNY commenced its tender offer on March 18, 1988. The offer is described in a prospectus of that date, whose sufficiency under presently existing circumstances fuels this federal securities law controversy.

In its March 18, 1988 prospectus, BNY offered to acquire all Irving's common shares by exchanging 1.575 BNY shares and $15 in cash for each Irving share. BNY conditioned its exchange obligation upon, *inter alia*, the tender of at least two-thirds of Irving's shares; BNY's determination that Section 912 of the New York Business Corporation Law would not prohibit the prompt consummation of a merger between Irving and a subsidiary of BNY; and the redemption or invalidation of Irving common stock purchase rights issued pursuant to a "Rights Agreement" dated October 9, 1987.

These last two conditions require some explanation. Section 912 of the New York Business Corporation Law ("BCL"), known in the vernacular as "anti-takeover" legislation, precludes a shareholder who acquires more than 20% of a corporation's stock without board of directors approval from effecting a subsequent merger for a minimum of five years. As for the Irving rights agreement, it was enacted by the

Irving board on October 9, 1987, after the board rejected BNY's original offer. This is a "poison pill" that allows Irving's shareholders to acquire $400 worth of stock for only $200 in any newly merged company when the acquiring company gains more than 20% of Irving's stock.

Of these particular conditions, BNY said in its prospectus that it "does not presently intend to waive" them although it "reserves the right to do so."

BNY's exchange offer was originally scheduled to expire at midnight New York City time on April 15, 1988. BNY subsequently extended the expiration date of the offer from time to time. When Irving commenced this litigation, under circumstances described below, BNY's revised exchange offer was scheduled to expire at midnight on May 24.

BNY also commenced efforts to take control of Irving's board by a proxy solicitation in advance of the 1988 Irving annual meeting, originally scheduled for April 21, 1988. On April 18, the Irving Board announced that it had approved a partial offer for 51% of Irving's shares made by Banca Commerciale Italiana ("BCI"), an Italian entity whose application for regulatory approval of the transaction is pending. The Irving annual meeting was adjourned, on the agreement of Irving and BNY, to May 6. On May 6, at least as certified by independent supervisors, Irving won the proxy fight. The incumbent board won reelection, defeating BNY's slate of candidates. BNY challenges the validity of the election and expresses an intent to challenge it in state court. However, the issues before me do not require further detailed comment on the subject.

On May 17 BNY took the step which leads directly to this litigation. It announced publicly that it was waiving the Section 912 condition and the Rights Agreement condition and extended its offer until midnight, May 24. That is to say, if BNY obtained a tender of at least two-thirds of the Irving shares, it was prepared to accept a five-year hiatus between the time of acquisition and a complete merger between BNY and Irving. BNY was also prepared to accept the dilution of Irving shares contemplated by the initial poison pill.

Also on May 17, BNY advised that if by 5:00 p.m. on May 20, a Friday, Irving would redeem the poison pill and waive the applicability of Section 912 to BNY's offer, BNY would increase the stock consideration in its offer to 1.675 shares of BNY stock.

On Thursday, May 19, the Irving board met and rejected BNY's proposal. In the Irving board's perception, by that action it "honored the mandate of the shareholders who had reelected the directors to continue to conduct the auction process" pitting BNY against BCI as rival bidders. Oral argument, May 23, 1988 hearing at Tr. 23.

It may be observed at this point that BNY does not accept Irving's characterization that a fair "auction" is taking place. Rather, BNY contends that Irving is preventing an auction in the true sense, in order to prefer a BCI bid less favorable to Irving shareholders, but having the advantage to present Irving directors of retaining them in office. Apart from observing that what is happening here does not particularly resemble auction acquisitions at Sotheby's or Christie's, I say nothing about these irreconcilable and volubly expressed perceptions. They do not bear directly upon the federal disclosure issues before me.

The Irving Board took one other step on May 19. It amended the Irving poison pill. Under that amendment, known as the "flip-in" amendment, any acquisition of 20% or more of Irving's shares, even in a tender offer for all shares, entitles the holders of rights, other than the 20% or greater holder, to buy $400 of shares for $200. This would bring about so dramatic a dilution of BNY's interest if it were to acquire two-thirds of the Irving shares, that BNY has stated that it would commit "economic suicide" if it proceeded with the acquisition in the face of the amended poison pill. BNY has said repeatedly it will not do that.

If litigation be equated with hell—as in some eyes it is—then it is fair to say that subsequent to the events of May 17–19, all hell broke loose.

Specifically, on May 20 Irving filed the captioned action in this case, and on May 23 moved for a preliminary injunction. BNY for its part, moved in New York State Supreme Court, New York County (Cahn, J.) for an order prohibiting enforcement of the flip-in amendment, directing the Irving board to redeem the poison pill rights previously adopted by the board, and compelling the board to approve for BCL Section 912 purposes the acquisition of Irving shares by BNY pursuant to BNY's current tender offer, as well as BNY's proposed second-step merger. That motion, vigorously opposed by Irving, has been argued before Justice Cahn, who has reserved decision.

Irving's motion for a preliminary injunction against BNY in this Court asks that BNY be enjoined from purchasing any Irving common shares pursuant to BNY's revised exchange offer or otherwise; disseminating false or misleading statements or offering materials relating to the exchange offer or other proposed acquisition of Irving shares; filing false or misleading statements with the Securities and Exchange Commission; voting Irving shares; using Irving shares; or taking other steps to acquire control of Irving "or in furtherance of BNY's unlawful scheme."

This Court has received briefs of counsel, affidavits and exhibits, and heard oral submissions of counsel at hearings on May 23, 24 and 26. At the May 23 hearing counsel for both parties took the position, which I accept, that an evidentiary hearing is not required to resolve the federal securities issues. Irving's preliminary injunction motion may be resolved on the basis of the documents.

The May 24 hearing was interrupted by the Federal Reserve Board's letter response, dated that day, to BNY's request that the Board extend the original 90–day period for BNY's approved acquisition of the Irving shares. The Board granted a 45–day extension of the period in which BNY is authorized to consummate the proposed acquisition. The Board granted that extension pursuant to certain conditions which form an important part in the federal litigation. Those conditions are treated at greater length in the discussion which follows.

## DISCUSSION

Irving's motion, filed on May 23, argued that BNY had not made the disclosures to investors federal securities laws required in respect of BNY's revised tender offer of May 17. Irving further argues that the Federal Reserve Board's action of May 24, and BNY's response to it, make BNY's obligation of further disclosure all the more apparent. The basic issue is well defined. BNY contends that federal securities laws do not require any further disclosure than that contained in the March 18 prospectus.

Irving points out that as a tender offer the BNY offer is subject to the disclosure requirements of the Williams Act Amendments to the Securities Exchange Act of 1934, 15 U.S.C. § 78n(d)–(e). Irving also observes that as an offering to the public of newly issued BNY securities, the BNY offer is also subject to the registration and prospectus requirements of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*

BNY does not challenge the general applicability of the two statutes. Their joint applicability in these circumstances is well established. *See* Securities Act Rule 432, 17 C.F.R. § 230.432 (requiring prospectus for securities issued in tender offer to contain full information required by Exchange Act rules and Securities Act requirements). However, in its brief Irving does not complain of any failure to disclose under the 1933 Act which would not also constitute a violation of the 1934 Act. Accordingly the analysis which follows focuses upon the Williams Act amendments to the 1934 Act, together with SEC regulations promulgated thereunder.

### A. *Propriety of Preliminary Injunctive Relief at this Time.*

At the threshold, I must consider whether the circumstances justify a preliminary injunction. The general rule is familiar enough. To obtain preliminary injunctive relief, the moving party must demonstrate irreparable injury if relief is not granted;

and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make a fair ground for litigation, together with a balance of hardships tipping decidedly in its favor. *See e.g., Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 836 F.2d 760, 763 (2d Cir.1988) (*per curiam*).

Initially BNY challenged Irving's threshold showing of irreparable harm, a position which if correct would ordinarily preclude any consideration of the merits. In addition, BNY suggested that Irving was guilty of laches, which would have the same effect. But BNY does not press that latter assertion, only faintly put forward at the March 23 hearing; indeed it is fair to say that both parties press for this Court's ruling at this time. In the totality of circumstances, I conclude that they are right to do so.

The pace of the significant economic game these parties are playing is quickening. The Federal Reserve Board has extended BNY's time within which to complete the acquisition for only 45–days from May 24. In the interim, as stated under Point B *infra*, the Board has limited BNY's authority to acquire more than 5 percent of Irving's shares until BNY gives further notification to the Board and obtains Board approval to proceed with the consummation of the proposal. At the conclusion of the May 26 hearing before this Court, BNY through counsel extended its offer until at least Friday, June 3, at the close of business. We cannot know when the state court will rule on BNY's motion for injunctive relief, or what appellate procedures may follow. *See* Point C, *infra*. The Federal Reserve Board has said, in its May 24 letter, that if BNY notifies the Board of its desire to proceed with consummation, the Board "is prepared to grant expedited consideration to any such notice filed by BNY."

▉ I had at one point considered whether the Board's conditional May 24 extension constituted, in effect, a "stay order" whose requirement of further notification and approval before consummation did away with the need of this Court's equitable interven-

tion at his time. But counsel persuade me that this is not so. The pot, to use another metaphor, is furiously boiling; the bubble of attempted consummation may rise to the surface at any time. Assuming for the sake of this analysis the correctness of Irving's contention that recent events require BNY to make supplemental disclose to investors, I am persuaded that investors are entitled to that disclosure now. There are two pragmatic reasons for this. First, Irving shareholders are entitled to disclosure of any presently existing, material circumstances as they confront the present June 3 deadline for tender. That is so, even if one may assume with some confidence that BNY would extend its offer again in case of need. Second, if this Court does not rule on Irving's federal claims now, fast breaking events may make it difficult for Irving to revive a midnight application to Judge Lowe or to me.

Finally, BNY itself points out that if this Court is disposed to direct further disclosure, the sooner BNY knows that the better, so that it may make timely compliance within the context of the Board's 45–day order. Otherwise, that directed disclosure and dissemination may take BNY beyond the extension, thereby costing it the transaction, to its own irreparable harm.

It is unusual to consider possible irreparable harm to the opposing party in determining whether the moving party has made its threshold showing, thereby rendering appropriate consideration of the merits. But equity is flexible where it must be to protect legitimate interests in the case at bar, as the Williams Act itself commands. The Williams Act extends its protection to all shareholders of the target company: "those who may decide to tender those shares and those who may not." Both groups must be assured full, fair and adequate disclosure so that their decision to tender or retain their shares will be predicated upon a knowledgeable and informed evaluation of the alternatives. *Commonwealth Oil Refining Co. v. Tesoro Petroleum Corp.,* 394 F.Supp. 267, 273 (S.D.N.Y. 1975). Forcing shareholders of a target company to make decisions without full

and accurate disclosure of material information by the acquiror causes an irreparable injury to them inherent in the nature of the transaction. And relief, if granted, must be given before the takeover is consummated, it being difficult thereafter to "unscramble the eggs." *Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.*, 825 F.2d 731, 739 (3rd Cir. 1987); *See also Life Investors, Inc. v. AGO Holding, N.V.*, [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98, 356 at 92, 197 (8th Cir.1981).

I find in this case pervasive present threat of irreparable harm, affecting both parties and the investing public, which justifies equity's attention.

Desiring, as it does, a ruling at this time, BNY no longer presses its defense of laches on the part of Irving. In any event, there was never substance to the argument. BNY announced the revised offer generating this litigation on May 17. It accompanied that revised offer to shareholders with an amended offer to the Irving board, which had to consider the offer before rejecting it on May 19. Irving filed the complaint at bar on May 20 and appeared with its motion for preliminary injunction on May 23. Counsel for Irving described at the May 23 hearing that sort of fevered weekend activity typical of these affairs, adding: "I had two hours sleep last night." Tr. at 23. I am quite prepared to accept counsel's representation. Irving and its counsel did not sleep on their rights; indeed, they did not sleep at all. There is no substance to a suggestion of laches.

Accordingly I turn to the question of whether the Williams Act requires further disclosure at this time by BNY to Irving shareholders.

B. *The Present Status of Federal Reserve Board Approval.*

██ Irving contends that federal law requires BNY to issue a supplemental prospectus describing the present status of Federal Reserve Board approval for the acquisition. To evaluate that contention, it is necessary to state in greater detail the post-May 17 dialogue between BNY and the Board.

As noted, on May 17 BNY publicly stated its intention to waive the then-existing poison pill provisions and the Section 912 obstacle to a prompt second-step merger, assuming that BNY acquired two-thirds of Irving's outstanding shares. As noted, BNY extended its tender offer to midnight May 24. The Board responded to that announcement with a letter dated May 19 to counsel for BNY. The Board wrote to counsel in part:

"To assist in the evaluation of this revised offer and the comments made with respect to the offer by Irving in a May 18 letter to the Board, we would like BNY's comments on the attached questions. We would appreciate your comments to the questions by the opening of business on May 23, 1988."

The questions the Board forwarded to BNY on May 19 included these questions, coupled with a particular direction:

"2. BNY should provide new *pro forma* financial statements and projections reflecting the revised offer (*e.g.*, the possibility of only an approximately two-thirds ownership interest in Irving). What adjustments, if any, have to be made to the projections or financial statements submitted in connection with the application in light of the proposed new structure? Please be specific. In particular, please provide narrative and supporting schedules that address the accounting treatment of the minority interest, the revised purchase price, computation of acquisition goodwill, the impact on cash flow, the impact of the reduced ownership on BNY's ability to achieve targeted tangible common equity ratios, and the effect of funding of any open-market purchase after the tender offer."

While BNY and its counsel were engaged in working up the answers to the Board's inquiries, counsel wrote to the Board on May 20 to request an extension, not to exceed 45 days, of the period for consummation of BNY's acquisition of Irving.

BNY's responses to the Board's inquiries of May 19 were sent forward in a letter of

counsel dated May 22. In response to the Board's second inquiry, quoted above, BNY forwarded to the Board copies of *pro forma* consolidated financial data it had filed with the SEC in connection with a recent public offering of preferred stock. That data contained a balance sheet as of March 31, 1988 and income statements for the periods ended March 31, 1988 and December 31, 1987. BNY also said this to the Board:

"Although BNY would be entitled to only two-thirds of the dividend stream from IBC, this will not present any difficulties in view of the corresponding reduction in cash flow requirements. Irving's estimate of 1989's net income, as filed with the SEC, is $281 million. From this amount, $15 million of dividends is payable on IBC's cumulative convertible ($100 million) and adjustable rate ($75 million) preferred stocks. This leaves $266 million of earnings available to common shareholders.

In order to service the financing requirements of the acquisition, total common dividends of $76 million ($51 million —.67) would be required ($51 million to BNY and $25 million to the minority interests). This would represent a common dividend payout ratio of only 28.6%. Even if IBC's published projections are overstated by as much as $50 million, only a 35% dividend payout ratio would be required. Moreover, in the event that IBC's projections are not realized by an even larger margin, BNY has additional sources of cash flow from its own operations, as previously presented to the Federal Reserve Board."

Under date of May 24, 1988 the Board responded to BNY's request for an extension. The Board's letter, grants a 45–day extension, but expresses a concern "that under certain circumstances consummation of the proposal might have an adverse effect on the capital adequacy, financial and managerial resources and future prospects of the institutions." In view of that concern the Board granted its 45–day extension of the consummation, "only upon the condition that before BNY may acquire more than 5 percent of [Irving's] shares

BNY notify the Board and obtain the Board's approval for BNY to proceed with consummation of the proposal." That notice would give the Board an opportunity to determine, "based upon the relevant facts and circumstances at that time, that consummation would be consistent with safety and soundness considerations." The Board concluded by declaring its readiness to "grant expedited consideration to any such notice filed by BNY."

BNY says these recent events require no additional Williams Act disclosure. It argues that the March 1988 prospectus revealed BNY's reservation of its right to waive conditions, and that the economic consequences of a less than total acquisition were discussed. In essence, the contention seems to be that nothing has changed.

I would have difficulty with that contention even if the Federal Reserve Board had not written its May 24 letter. The Board itself, responding to BNY's May 17 announcement, characterized in its May 19 letter BNY's action as a "revised offer", and called for further information so that the revised offer might be evaluated. But any lingering doubts about the need for further disclosure are dispelled by the Board's May 24 letter, which as a practical matter withdrew BNY's prior authority to acquire up to 100 percent of Irving's shares, and limited that authority to 5 percent unless BNY sought and obtained further authority from the Board. These developments are of obvious material significance to Irving shareholders.

BNY must accordingly issue and disseminate a supplemental prospectus disclosing these events. The present position of the Board, as stated in its May 24 letter, must be accurately summarized. The updated *pro forma* financial statements must be disclosed to the extent that they modify or clarify financial statements contained in the original prospectus. I make that direction in principle, and leave it to counsel to execute it in practice. The Court will resolve disputes in case of need. In any event, the projected dividend requirements I have quoted *supra* must be disclosed.

## C. *State Court Litigation.*

█ Irving says BNY should disclose its intentions in respect of BNY's motion for injunctive relief now *sub judice* before Justice Cahn. BNY responds that it cannot reasonably be required to decide, and hence to disclose, what it will do until Justice Cahn does whatever he is going to do.

That argument has a surface appeal, but in the last analysis is not persuasive. As the oral argument made clear, what is really at issue is BNY's intent if Justice Cahn rules in its favor, invalidates the poison pill and directs the Irving board to remove any Section 921 impediment to a prompt merger, and then Irving gives timely notice of appeal. Would BNY go ahead and purchase tendered Irving shares, in the face of a possible reversal of Justice Cahn's order? BNY has said, after all, that its purchase of Irving shares would be economically suicidal if those shares were subject to amended "flip-in" poison pill dilution. Counsel for BNY has said in argument to Justice Cahn that BNY "intends to extend its offer from time to time within the outer limits of the regulatory framework so as to allow the judicial process to operate with respect to this application both hear and in the appellate division." That sounds as if an Irving appeal would inhibit BNY from purchasing Irving shares, at least until BNY obtained an affirmance at the appellate division level; but *quaere* about the New York State Court of Appeals.

At the argument before me, BNY counsel stated, as indicated, that its present intention, within the context of the state court litigation, was to wait and see what Justice Cahn decides, and then decide what to do about it. I agree with BNY's counsel that they cannot fairly be required to say more than that now; but I also conclude that the Williams Act requires them to say at least that to Irving shareholders, if such be the present limits of their intentions. The original prospectus properly recognized the obligation to advise investors of pertinent pending litigation, including the New York State court litigation in its then existing posture (see prospectus at p. 3). I agree with Irving that a supplemental prospectus must bring investors up to date on the present litigation position, with particular reference to the matters which I have just discussed.

## D. *Antitrust Issues.*

█ I agree with Irving that, given present circumstances, disclosure must be made of a potential risk of antitrust complications.

While a potential antitrust violation was considered by the Federal Reserve Board and subsequently by the District of Columbia Circuit Court of Appeals in the case at bar, it is apparent from the Court of Appeals' discussion of the issue and the cases it cites (845 F.2d at 1041–1042) that the anti-competitive effect of a merger between BNY and Irving was analyzed under Section 7 of the Clayton Act, 15 U.S.C. § 18. Judged by Clayton Act criteria, the Court of Appeals agreed with the Board that "there is no adverse competitive impact bar to the merger." *Id.* at 1042.

Under BNY's revised offer of May 17, there would be no merger for at least five years. Rather than "the combined entity" contemplated by the Court of Appeals, *id.* at 1041, BNY would be the majority shareholder of a rival banking institution.

Accordingly, and apparently for the first time in the regulatory and litigation history of this proposed transaction, questions of violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 arise. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent and its wholly owned subsidiary were incapable of conspiring in violation of Section 1 of the Sherman Act. But the Court added: "We do not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own." Those are the circumstances that would obtain if BNY's revised offer for Irving shares is consummated. Subsequent lower court decisions have gone off, to a certain degree, in different directions with respect to the question left open by the Supreme Court in *Copperweld.*

Counsel for BNY argue that the responsible bank officers would have to be "crazy" to so conduct themselves as to subject BNY and Irving to a charge of *per se* Sherman Act violations. Counsel argue, not surprisingly, that their clients would not act in an irrational fashion. But the Williams Act disclosure question is not so much the likelihood of future antitrust violations as it is the risk of future antitrust challenge. Given the changed circumstances and the present state of the law, I conclude that BNY is obligated to say something in a supplemental prospectus about the issue.

E. *BNY's Selection of Directors if its Offer Succeeds.*

██ Irving contends that BNY is now obligated to disclose its intentions with respect to the makeup of the Irving board if BNY obtains control as the result of the revised may 17 offer. BNY acknowledges that if it presently contemplated particular individuals to place on the board it would need to make that disclosure; but denies any such present intent. But Irving says that is not enough. Irving says that shareholders are now entitled to a statement from BNY as to whether truly "independent" directors would be selected, or whether the Irving board would be dominated by BNY officers or affiliated individuals lacking that degree of independence.

I conclude that the Williams Act does not require any further declaration by BNY on the subject of directors. It is apparent from recent events, in particular the proxy battle, that if BNY obtains control of Irving, it is going to change Irving's board. Irving shareholders are perfectly able at the present time to factor into their decision-making process the possibility that BNY would change not only the present personnel, but the character of the Irving Board. The particular manner in which BNY may address that issue in the future, if it obtains control of Irving, need not, and on counsel's representation, probably cannot be disclosed at this time. *Cf. Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 871–72 (2d Cir.) *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

I have considered the other demands for disclosure made by Irving, and reject them, seeing no need for further discussion.

## CONCLUSION

Because I have concluded that BNY must issue and disseminate a supplemental prospectus addressing certain issues, I make this temporary restraining order at this time:

The Bank of New York, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are temporarily restrained for a period of ten (10) days of the date of this order from purchasing any shares of Irving common stock pursuant to the Bank of New York's exchange offer or otherwise.

During that ten-day period contemplated by this temporary restraining order, counsel for the plaintiff Irving Bank Corporation are directed to settle an order of preliminary injunction consistent with this opinion on two (2) day's notice.

The order of preliminary injunction will provide that BNY's offer be extended for six (6) business days following the additional disclosure to be directed.

The foregoing is SO ORDERED.