Jason BECKER, et al.

v.

**FEDERAL RAILROAD ADMINISTRA-TION and National Railroad Passenger Corporation.**

No. 3:95CV01076 (PCD).

United States District Court,
D. Connecticut.

Dec. 30, 1996.

Charles C. Goetsch, Cahill, Goetsch & Dipersia, P.C., New Haven, CT, Robert A. Fasanella, Ann M. Sobolewski, Fasanella, Johnson & Wood, Boston, MA, for Plaintiffs.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, for Defendant, Federal Railroad Administration.

David R. Schaefer, Brian P. Daniels, Brenner, Saltzman & Wallman, New Haven, CT, James A. Rogers, Neil J. King, Carol A. Clayton, David H. Topol, Wilmer, Cutler & Pickering, Washington, DC, for Defendant, National Railroad Passenger Corp.

## RULING ON MOTIONS FOR SUMMARY JUDGMENT AND FOR PERMANENT INJUNCTION

DORSEY, Chief Judge.

Pending is plaintiffs' motion for a permanent injunction to preclude defendants from

electrification of defendant National Railroad Passenger Corporation's (Amtrak) Northeast Corridor line from New Haven, Connecticut to Boston Massachusetts. That motion included a preliminary injunction which has been denied. Also pending is defendants' motion for summary judgment asserting the complaint to be without factual merit.

### FACTS:

A Northeast Corridor Improvement Project (NECIP) is Amtrak's response to a congressionally mandated improvement of rail service between Boston and New York. The proposal would extend the present electrification to Boston from New Haven to permit electric power to move trains faster and without changing engines in New Haven as is presently the case. The Federal Railroad Administration (FRA) issued a Programmatic Environmental Impact Statement (PEIS) in 1978 and a final EIS (FEIS). The PEIS described the project generally and its technological aspects, including electrification, and alternative routes. The FEIS supplemented the PEIS, dealing with the project and its components in greater detail. The extent of electrification was determined in 1991.

Congress enacted the Amtrak Authorization and Development Act in 1992, Pub.L.No. 102–533, 106 Stat. 3516, which required FRA to issue a plan by which a three hour trip between New York and Boston would be achieved, safely and dependably. The resulting Northeast Corridor Transportation Plan (NECTP) was presented to Congress on July 11, 1994. It called for the noted electrification and use of the shoreline route, deemed necessary to meet Congress' mandate.

An environmental review resulted in a Record of Decision: Northeast Corridor Improvement Project Electrification–New Haven, CT. to Boston, MA. (May 9, 1995) (ROD) which included consideration of the FEIS. The ROD noted the appropriate use of electric motive power, operating characteristics, maximum speed, acceleration and deceleration rates, reliability and maintenance costs. Id. p. 3. Since 1991 Congress has appropriated $292,800,000 of the total $390,000,000 electrification cost, none of which was released for construction until the ROD was issued.

The FEIS premises that improved rail service will result in 60.7% of rail/air travel between all points from New York to Boston will be by rail as opposed to 39.9% by air. Plaintiffs dispute that claim, citing such trips between New York and Washington, D.C. which have not reached that percentage. Defendants note, without dispute, that of all such trips on the line from New York to Washington, 65% travel by rail. Intermediate stop travel is 70% by rail.

Three alternative routes between New Haven and Boston were considered. The FEIS noted advantages of each route at specific locations. Plaintiffs note safety hazards at grade-crossings without suggesting alternative routes would not involve such. Defendants note the FEIS discusses grade-crossing safety. The FEIS does not appear to determine a choice of route based on safety alone. It notes a substantial time span that would be required, beyond the time frame set for the project, to obtain required permits and approvals for construction of either alternative to the shore route. Also noted is a substantially higher capital cost for construction of either of the alternatives to the shoreline route, a significant factor in the absence of appropriations sufficient for a more expensive route and Congress' unlikely appropriation of higher amounts to construct either alternative.

The shoreline route includes five movable bridges over waterways used by commercial and pleasure boats.

Multiple ownership and use of the shoreline route is cited but with no showing that the trip-time goal would thereby be prevented.

The FEIS discussed the By–Pass route along I–95 and found it to be deficient due to adverse environmental impacts, permits needed and problems posed by construction though it would eliminate grade crossing and five bridges. The Inland and Airline routes were reported unfavorably based largely on expense and delay.

Electric motive power was chosen over turbo electric engines. In making this determination, a yet-to-be-developed form of turbo

electric engines which can meet the three-hour trip requirement was considered, but rejected. Turbo units have been commented on favorably in various quarters as have dual traction units which have power limitations on grades.

The cost of electrification was not justified in the FEIS on the basis of a cost/benefit analysis. Yet-to-be-developed trains' emissions have not been evaluated.

Energy loss was accounted for in the FEIS, from generation point to meter and thence from substation to locomotive. Popoff Affid. ¶¶ 5–8, Yachmetz Affid. ¶¶ 89–90. Though not calculated, the loss will be offset by regenerative braking and use of new engines.

A protocol approved by EPA and the DEPs of Connecticut, Rhode Island and Massachussetts was followed in the FEIS discussion and analysis of hazardous air pollutants, volatile organic compounds and nitrous oxides, the precursors of ozone.

Train horns required to be blown will increase by four soundings for each additional train at each crossing.

No bird species survey along the shoreline route was performed but no adverse effect on birds from the project is suggested.

The FEIS notes a measurement of current vibration and comparison to prototypical equipment vibration.

The FEIS discusses the unquantified increase of noise and vibration along the right of way from more and higher speed trains.

## DISCUSSION:

■ Plaintiffs allege defendants' non-compliance with the reviews mandated by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. Plaintiffs seek to enjoin pursuit of the NECIP for want of full consideration of its environmental impact as required by NEPA for which 40 C.F.R. § 1508.7 is cited. The issue presented is not whether the court approves the agency's decision as to a course of action. See *Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), (quoting *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827 (D.C.Cir.1972); *Strycker's Bay*

*Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–29, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 555, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1383 (2nd Cir.1977)). It is sufficient if defendants have compiled adequate "relevant information, [have] analyzed it reasonably, [have] not ignored pertinent data, and [have] made disclosures to the public." *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1029 (2d Cir.1983). Consideration of environmental effects of the project, including alternatives, is required. See *I 291 Why? Association v. Burns,* 372 F.Supp. 223, 254 (D.Conn.1974). The court's inquiry is not whether the agency decision achieves "particular substantive environmental results", *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), but whether "adverse environmental effects of the proposed action are adequately identified and evaluated" without preclusion from "deciding that other values outweigh environmental costs." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). A record reflecting consideration of detailed information concerning significant environmental impact, available to permit public comment, is required. Id.

### I. *Alleged faulty decisions (process):*

### A. Agency Bias in Approving the Project.

■ Plaintiffs claim defendants were predisposed to electrify the shoreline route and gave no real consideration to alternatives, demonstrating bias and making the environmental review a charade. They base that claim on conclusions in the several studies done between 1978 and 1994 and the expenditure of funds for the project before the FEIS. The extent defendants arranged and considered the several studies, the administrative record's demonstration of the extent of the hearings and consideration given to the matters, all belie plaintiff's contentions. Calling a NEPA study a charade as a foregone conclusion without substantiating evidence is not a meritorious argument. *Coun-*

*ty of Suffolk v. Secretary of the Interior,* 562 F.2d at 1390. Defendants' assertion that no money was expended before the ROD, though appropriated is uncontradicted. Thus this is not a case of commitment by action before the FEIS. Nor are the "errors" cited by plaintiffs suggestive of defendants' tailoring the record to substantiate the decision. The explanations offered suggest that there were not "errors" but rather, that plaintiffs have misconstrued what actually occurred. For example projections of ridership cannot absolutely be guaranteed but defendants' judgment that the project will attract additional train passenger cannot be found to be unsupported. Defendants cannot be faulted for accepting opinions which appear to be made in good faith and with adequate foundation, notwithstanding opposing expert views. Not all the projected riders may be drawn to the rails by a three hour New York to Boston trip. The projections are not shown to be more likely if the trains follow a different route or are hauled by other than an electric locomotive. Realization of the projections, and in turn the anticipated revenue and reduction in airline and motor vehicle travel, are all subject to the whims of travelers and a myriad of factors unrelated to the rail service. That uncertainty does not invalidate defendants' otherwise apparently proper forecasts.

B. Route Alternatives.

■ The proposal would follow, electrify and improve the shoreline route. Plaintiffs flag three alternative routes, a Shoreline By-pass Route, an Inland Route and an Airline Route. Defendants' inadequate consideration of each arguably results in greater negative environmental impact. Many shoreline route improvements have already been accomplished. ROD 19.

1. *Shoreline Bypass Route.* A Commuter–Intercity Study suggests that this route would save 30 to 39 minutes, permitting a 3 hour trip, at a cost of $850,000,000, particularly if dual traction turbo engines are used. This and an Amtrak Feasibility Study were allegedly inadequately considered in rejecting the By-pass Route.

Plaintiffs note the curves on the Shoreline Route, 16 grade crossings with attendant safety risks and 5 moveable bridges which interfere with water traffic. Crossings pose greater hazards with increased, faster trains. The By-pass would alter the Shoreline Route to eliminate the deficiencies, i.e. curves, grade-crossings and waterway bridges. The curves are cited as factors in the speeds which may be sustained but the planned speeds appear reasonably likely to meet Congress' mandated 3 hours trip time. Grade crossing safety was not an ignored factor.[1] FRA concluded alternative route advantages were outweighed by impact of the required construction on the alternatives and the transfer of impacts to land adjacent to those routes. Reasonably FRA also noted the time, uncertainty and delay obtaining permits and approvals to construct the other routes, jeopardizing the mandated completion schedule. Further FRA properly noted Congress' contemplation of the cost ceiling which would not be sufficient to construct an alternative route. FRA's conclusion that an alternative route would prevent completion of the project within Congress' time frame and cost expectation and would not offer clear environmental advantage over the Shoreline Route, FEIS Vol. I, 2–16, was a reasonable judgment considerate of relevant environmental impact. See *Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 461–62 (1st Cir.1989); *Westside Property Owners v. Schlesinger,* 415 F.Supp. 1298, 1302–03 (D.Ariz.), aff'd. 597 F.2d 1214 (9th Cir.1979); *Commonwealth of Kentucky, ex rel. Beshear v. Alexander,* 655 F.2d 714 (6th Cir.1981). Cost-benefit studies of alternatives are not required by Council on Environmental Quality Regulations. 40 C.F.R. § 1502.43.

Multiple ownership of the Shoreline Route is irrelevant as it also applies to the alternatives, with no different environmental impacts. Assumed delays from other track usage is unsubstantiated. The capacity of New York's Pennsylvania Station effects all routes.

1. Plaintiffs tout the Inland Route which has 57 grade crossings.

■ Evidence that other routes are feasible and appropriate is not determinative of NEPA compliance. A reasonable inquiry compliant with NEPA is not defeated by disagreement with the determinations based on that inquiry. Failure to detail measures required for grade crossing safety and reasonable accommodation of waterway traffic are not FEIS deficiencies which preclude the project.

2. *Inland Route.* This route was purportedly rejected based on stale data from the 1978 PEIS. Defendants note studies and updated information after the PEIS extensively examined this route in 1978. The claim of stale data is not substantiated. There is no evidence of disregard of subsequently developed facts. FRA has undertaken additional analyses, further explanations of potential impacts, design refinements and measures to mitigate impacts. Competing freight and commuter traffic on this route pose substantial safety/operating problems. FEIS Vol. I, 2–7 et seq. The FEIS was brought forth in November 1994 and subjected to public comment until March 1995. FRA approved the Project with comments, Designated Administrative Record (DAR), Item 21, and specified, as conditions, additional mitigation measures. Id. Item 23. Actual grade crossing installation and bridge operation can be detailed during construction, maintenance and operation of the line.

■ The FEIS reflects development, analysis and consideration of all relevant environmental factors followed by a reasoned choice of an improved route for the NECIP. While plaintiffs have offered cost estimates at odds with those used by the FRA, the latter originate with a respectable source, are not shown to be clearly invalid and have been reviewed by two other agencies. FEIS, Vol. I, 2–11, 2–13. FRA's cost analysis is not shown to be unsound, and is entitled to deference. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *Baltimore Gas & Electric Co. v. Natural Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

It is not shown to be deficient in the ultimate choice of other than the Inland Route.

3. *Airline Route.* This route was purportedly rejected based on stale data from the 1978 PEIS, an argument plainly without merit since the PEIS did not consider the Airline Route. Current data was developed. FEIS Vol. I, ch. 2, note 16. Essentially consideration of this route is also alleged to have been inadequate. As for the other alternatives, the FEIS does not reflect disregard of any relevant environmental factors. It reasonably explains the basis for the choice over the Airline Route and over the other alternatives. FEIS Vol. I, 2–15 to 2–16. The suggestion to run trains on more than one route is without merit as duplicating costs. This route would entail the cost of total reconstruction of the right of way.

C. Traction Alternatives.

■ Electrification of the Shoreline Route and use of electric locomotives is the proposed method of achieving the train service mandated by Congress. It is a logical extension of the existing electrification and use of such locomotives between Washington, D.C. and New Haven. It would eliminate various operating factors resulting from a change of motive power at New Haven. The choice among the traction alternatives is faulted by plaintiffs but it is to be remembered that the traction choice is not for the court to make. Reviewed as an environmental matter, the same question is here presented as is above discussed, i.e. whether the record reflects adequate development and consideration of facts relevant to the environmental issues presented. In several recent attempts no high speed, non-electric, rail systems have been developed since 1981. Amtrak has demonstrably extensively explored non-electric motive power and found it insufficient to meet NECIP goals.

II. *Alleged deficient consideration (specified subjects):*

A. Inadequate consideration of a Turbo Train.

Defendants' consideration of alternative methods of traction east of New Haven is

documented. Eight non-electric methods were studied, three of which were considered, after initial screening, as viable alternatives. FEIS Vol. I, 2–18–to 2–20. Two such were locomotives (one a gas turbine) with an alternative power pickup to be used where the line is already electrified. Id., 2–10 to 2–24. These comparisons, including a gas turbine, refute the claim of inadequate consideration of traction alternatives, see FEIS, Vol. I, 2–24 to 2–27, though one alternative, the FRA–150, could not be fully evaluated as it has not yet been sufficiently developed.

Some claims have no bearing on environmental considerations. These include switching engines in New Haven as causing delay in two cases, the ability of alternative traction to meet the time requirement of 3 hours, the power limits of the Rohr Turboliner, the position of the Coalition of Northeast Governors (CONEG).[2] Plaintiffs flag vulnerability to power outages without quantifying experience, cost or resulting delays or showing that defendants' cost studies have failed to account for such as maintenance costs.

The record, and particularly the FEIS, reflect consideration of alternatives and a choice which is sufficiently explained. It precludes finding a failure to consider alternatives to electric locomotives. This includes the cost of turbo operation and maintenance, absence of construction of turbos, elimination of turbos which have been operated, Amtrak's use of a turbo engine in 1992–93, see FEIS Vol. I ch. 4 n. 21, and worldwide satisfactory performance of electric locomotives relied on in the selection of electric locomotives which concededly have not yet been operated. The ROD decision to use electric motive power and not to wait for a turbo engine cannot be said to reflect a pell mell rush into a project solution in disregard of environmental considerations. A turbo engine which may meet the operating requirements is not now available nor is one being manufactured. It would have to be developed and could entail uncertain Congressional development funding. FRA requests for appropriations with which to develop non-electric motive power have not been fully funded and as late as 1994 were rejected. Nor can it be found that the FEIS reflects a choice of motive power in disregard of a motive means less environmentally damaging. The FEIS is not presently shown to reflect a failure to develop and analyze, thoroughly and completely, the risks to the environment from electrification and all the relevant factors, including minimization of environmental impact.

**B. Noise and vibration.**

 Plaintiffs note that these impacts were measured for existing trainsets and not those to be used which, from higher speeds, will increase noise and vibration. This conjecture is not substantiated. Defendants necessarily projected from ascertainable characteristics of operating trains, using both best and worst case scenarios. The trains to be used are not now available. The projections were not tempered by advances in noise and vibration suppression to be incorporated in new engines, Carol Affid. ¶¶ 36–38; Yachmetz affid. ¶ 84, and do not violate NEPA. See FEIS Vol. I, 4–18, 4–24–table 4.4–4, and 4–26, table 4.4.6. Plaintiffs' citation of those within hearing of points of origin does not demonstrate FRA's failure to evaluate the impact. Further, this argument does not support a challenge of the route chosen nor the motive power to be used. FRA has considered the noise and vibration impact including during construction and sought to mitigate both. FEIS Vol. I, 3–44, 4–110 to 111, 5–10 to 11; Vol. I 4–19, 4–26, Table 4.4–6, Vol. II 4–73. The noise and vibration issues apply to any route. Were they valid, any increased service would be precluded, no matter which route is chosen.

**C. Emissions.**

 Plaintiffs claim that only emissions from electric locomotives were measured without accounting for the emissions from generating plants. With elimination of diesel engines from the New Haven to Boston route, their emissions will disappear. As

**2:** Without contradiction defendants cite CONEG's 1987 and 1989 reports as supporting interim alternative locomotion absent long term funding but reflecting a long-term commitment to electrification.

electricity is generated to power the new engines, emissions will be created. Any increased use of energy to propel an increased number of trains will increase emissions. The FEIS justifiably allowed for greater efficiency in the new engines and planned train sizes and projected emissions from generation of the required energy. See FEIS Vol. I, 4–37 to 4–38. Without refutation, defendants contradict the claim that generating plant emissions were not considered. See FEIS Vol. I, 4–83 to 4–86. tables 4.10–4 to 4.10–7; Vol. II 7–8 to 7–13, 7–26 to 7–27. Those emissions are justifiably regarded as conservative as they don't account for generating plant reductions already accomplished and to be achieved pursuant to the Clean Air Act. Nor were the projections tempered by hydro-electric and nuclear generation which produce no emissions. FEIS Vol. I, 4–91. The emissions from fuel mixes is discussed. FEIS Vol. I, 4–41, 4–91. The emissions from use of turbo trains were included. FEIS Vol. I, 2–27 to 2–28, 4–84, table 4.10–4;, Vol. II, 2–74. Volatile Organic Compound emissions are discussed including those from extraneous sources as showing general trends. Ozone exposure is discussed and noted to comply with state standards. FEIS Vol. II 7–2, 7–3, 7–14.

■ Hazardous Air Pollutants are discussed, though qualitatively, not quantitatively, in FEIS Vol. I, 4–86 to 4–87, which is an analysis approved by the EPA and state environmental agencies. Plaintiffs' experts dispute the adequacy of the consideration of emissions by experts credited in the FEIS. Plaintiffs do not demonstrate failure to consider emissions impact, their content nor their likely increase with increased power generation. Review of the conflicting reports demonstrates a definite dispute as to proper study methods, air content parameters, accuracy of conclusions, fuel mix properly to be considered, ability to quantify emitted particulates and propriety of reliance on environmental agency standards and protocols. Such disputes, however, do not demonstrate defendants' failure to consider the

relevant factors regarding the impact of increased power generation. What is shown is a difference of opinion as to the conclusions properly drawn. Approval by responsible environmental enforcement agencies cannot be ignored. Existence of contrary views does not entitle the court, in review, to reject an agency's reliance on the reasonable opinions of its experts nor to determine what it considers the best methodology available. See *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1359 (9th Cir.1994).

### D. Electromagnetic Field Radiation (EMF).

■ Plaintiffs flag this radiation as health related. Defendants noted extensive discussion of EMF issues including those raised by Stephen Smith, on whose affidavit plaintiff relay. See FEIS Vol. I, 4–28 to 4–36; Vol. II, 5–1 to 5–92; Draft EIS Vol. III, 5–1 to 5–5; and Summary of Comments 144–49 (Admin. Record, Item 21). Noting the current lack of definitive evidence of adverse health impact caused by EMF, the FEIS did not dismiss the question. It was discussed adequately. See FEIS Vol. I, Ch. 4, note 14; 4–28 to 4–29. At most plaintiffs show a difference of expert opinion. The court's role is not to resolve opposing views. FRA's assessment, including exposure of passengers, is entitled to substantial deference. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

### E. Improper Segmentation.

■ Plaintiffs note that electrification of the route between New Haven and Boston is but one of nineteen projects [3] which facilitate high speed rail service planned by the NE-CIP and the NECTP, for the Northeast Corridor from Washington, D.C. to Boston. They argue that proper environmental im-

3. FEIS Vol. I, 1–7 to 1–9. To allow more trains and to enhance safety and dependability, 33 other projects are identified.

pact evaluation requires consideration in the FEIS of not only the New Haven to Boston electrification but of all the NECIP projects. The FEIS characterized the other projects as "separate and distinct from the electrification project". FEIS Vol. I, 1–6. Because all the projects were integral to the goal of the entire project, a high speed corridor servicing more riders, the FEIS must assess the impact from completing all fifty-two. This would appear to have been done in the PEIS but is allegedly inadequate for the NECTP which includes electrification. Plaintiffs concede that the PEIS considered electrification as one element of the NECIP. They nonetheless assert the necessity of a new EIS for the NECTP or an updated PEIS, citing 40 C.F.R. § 1502.9(c). Supplements to draft or final EISs are required for any substantial changes in the planned action relevant to environmental concerns and, if significant new circumstances or information is developed relevant to environmental concerns, related to the proposed action. Id. This requirement is also embodied in CEQ regulations and DOT orders.

▮▮▮▮ Cited as substantially changed factors, but considered in the FEIS, are electromagnetic fields [4], non-Amtrak users of the route [5], marinas [6], coordination with State transportation projects [7] and visual impact on coastal areas [8]. Plaintiffs' argument that a reassessment of the entire project for environmental impact is required because the present trip goal between New York and Boston is three hours while the 1978 plan, and PEIS, propose a 3 hour and 40 minute trip time, is without merit. Though claimed, plaintiffs make no showing that the electrification proposed makes the project a new one, unrelated to the NECIP. It is within CEQ rules that the PEIS constitute the broader EIS pertaining to the entire project and that the FEIS properly assessed the requisite environmental factors related to the specific project, here electrification. Described as

"Tiering", it is an appropriate EIS approach for sequential statements "[f]rom a program, plan or policy [EIS] to a program, plan or analysis of lesser scope or to a site-specific statement or analysis." 40 C.F.R. § 1508–28(a). The FEIS properly dealt with electrification as one element of the NECIP while the latter encompasses the whole Washington, D.C. to Boston project. Other site specific (160 of them) analyses have been performed. See FEIS Vol. I, 1–2. The FEIS constitutes the required analysis of the electrification phase of the entire project, supplementing and updating the PEIS in respect of the environmental concerns related to electrification. The FEIS is not deficient as to require revisiting the entire project and redoing the PEIS for individual phases of the project such as the electrification. Nor does any CEQ regulation cited by plaintiff require such revisitation. The FEIS has adequately addressed the affected areas of concern. See Defendants' Memorandum, p. 52, n. 46. That the PEIS was done eighteen years ago does not necessarily make it either stale or no longer useful. Plaintiffs have shown no such deficiency in the FEIS as it relates to the PEIS to warrant redoing the entire process. Plaintiffs argue that the PEIS is outdated and thus requires a substantial if not total redoing, citing *Coker v. Skidmore,* 744 F.Supp. 121 (S.D.Miss.1990). They fail to note the reversal of that decision and the Court of Appeals holding that mere age of an EIS is not grounds for its invalidation. Rather the question is whether the original proposed action is substantially changed or are there significant new circumstances or information relevant to the project and its environmental impact. *Coker v. Skidmore,* 941 F.2d 1306, 1310 (5th Cir.1991), citing 40 C.F.R. § 1502.9(c). Plaintiffs have made no showing of such. In particular a change of 40 minutes in the projected train running

**4.** Vol. I, 3–14 to 3–16, 4–28 to 4–36, 5–5, Vol. II, 5–1 to 5–34.

**5.** Vol. I, 3–8, 3–23 to 3–27, 4–7 to 4–9, 4–54 to 4–70, 5–1 to 5–2, 5–8 to 5–9.

**6.** Vol. I, 3–8 to 3–9, 3–27 to 3–29, 4–9 to 4–10, 4–70 to 4–73, 5–9.

**7.** Vol. I, 4–60 to 4–70, 4–73 to 4–81, 5–9 to 5–10.

**8.** Vol. I, 3–34 to 3–41, 4–10 to 4–14, 4–93 to 4–103, 5–10 to 5–20.

time does not so alter the project as to meet plaintiffs' burden.

 Plaintiffs cite three aspects as connected to electrification, requiring joint consideration, relying on 40 C.F.R. § 1508.25(a)(1); replacement of the Niantic River Bridge, construction of a new freight line between Davisville and Boston Switch in Rhode Island, and grade crossing elimination. They have not shown that the impact on the environment of electrification is altered by the three other projects. All three were considered as part of the NECIP and were addressed in its PEIS. Though part of the entire project, the three are not shown to be connected. They do not "automatically trigger other actions which may require environmental impact statements;" they do not involve "other actions [being] taken previously or simultaneously;" nor are they "interdependent parts of a larger action [nor do they] depend on the larger action for their justification." Id. §§ (i)-(iii). Discussing their environmental impact separately is proper under the tiering provision of 40 C.F.R. § 1508.28. No interrelation, nor interdependence, between electrification and the bridge, the rail line and the grade crossings is shown except that they present point specific matters on the line to be electrified. Indeed the crossings are matters of local jurisdiction and responsibility. While train speed is a factor as to what to do about the crossings, that decision is not within 40 C.F.R. § 1508.25(a)(1)(i)-(iii). The new rail line is not an Amtrak project, but a possible Rhode Island development project unrelated to electrification. If accomplished, it may require the addition to Amtrak's main line of an accommodating freight line, provision for which is covered in FEIS Vol. I, 4–8 to 4–9 and 5–1 to 5–2. None of the three require electrification or vice versa. See *Thomas v. Peterson,* 753 F.2d 754, 758–59 (9th Cir. 1985); *Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 836 F.2d 760, 763–64 (2d Cir.1988). Absence of interdependence of each of the three and electrification permits independent consideration. *Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294 (D.C.Cir.1987); *Sylvester v. United States Army Corps of Engineers,* 884 F.2d 394 (9th Cir.1989).

**F. Mitigation Matters.**

 Plaintiffs flag issues of noise, vibration, impact on those in contact with navigable water bridges, and grade crossing safety. Without saying how or why, plaintiffs argue that the discussion of these matters in the FEIS is inadequate. The obligation is not to propose conclusive correcting measures. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 353, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The FEIS sufficiently discusses mitigation related to electrification to meet the test of *Robertson.* FEIS Vol. I, 5–1 to 5–20, supplemented by ROD 11–17. The latter specifies and mandates the required environmental impact mitigation, both corridor-long and point-specific. See Rod, 1, FEIS Vol. I at 5–1. As discussed above, accommodation of marine traffic and the likely vibration is not inadequate. Amtrak has not only gathered information as to the likely impact but is set to continue the process including, as to bridges, an advisory marine board. See FEIS Vol. I, 5–2 to 5–4, 5–9; ROD 25–27, 30–31. Implementation can properly be deferred until the electrification is further along and the actual impact can be more accurately assessed. *Robertson v. Methow Valley Citizens Council,* 490 U.S. at 352–53, n. 16.

**G. Harm Asserted.**

Mr. Nixon and Ms. Lage assert their property will be damaged by vibration and loss of value. They are already situated adjacent to a rail line. They make no showing of the reasonably likely effect. Amtrak could schedule more trains without electrification.

The Cannons cite vibration, increased noise and the undefined effect of concrete ties. Abutters are not entitled to preclude either increased rail traffic or roadbed improvement under the guise of environmental protection. The claim that buyers would be discouraged by electro-magnetic field generation is speculative.

The Sheard's speculation of damaged hearing and unspecified stress related effects of the electrification is unsubstantiated.

The Breen assertion of noise, vibration and loss of view (poles, wires and signal towers have been in place along the right of way for many years) has been discussed and does not warrant a bar to Amtrak's project to ameliorate problems created by mobility of the population. Mrs. Breen has already moved from the site.

The marine tradesmen are not being shut out. Boaters now have limited movement under existing bridges. Scheduling openings around train movement is planned and discussed in the FEIS. While some boaters may relocate for want of ability to move through bridges upon demand, the inconvenience of moving through bridges on a schedule is not so great as to pose an unreasonable accommodation to meeting of the needs/wants of others. Bridge operating plans remain open as bridge use studies are ongoing. ROD 27; FEIS Vol. I, ES–10.

III. *Injunctive Relief:*

█ FRA has determined that it has complied with NEPA and therefore it has permitted Amtrak to proceed. The court should only intervene if irreparable harm is likely absent injunctive relief. *Town of Huntington v. Marsh,* 884 F.2d 648, 654 (2d Cir.1989). The mitigation provided in the FEIS and ROD will significantly dampen impacts projected by plaintiffs, both in constructing and operating the rail line. Plaintiffs have not shown increases of noise, vibration and view interference to warrant enjoining the project.

**CONCLUSION:**

As plaintiffs concede, NEPA requires an agency proposing a course of action to stop and think about the effect of the proposal on the environment. It is apparent here that the FRA has reflected at length and in detail on the environmental factors concerning which plaintiffs here complain. FRA's ROD has not met plaintiffs' standards, nor their view of the end result. Yet it is not for the court to decide the magnitude of the phenomena that will occur if the project is completed nor to "substitute its judgment for that of the [FRA] as to the environmental consequences" of the chosen course of action.

*Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). It is the court's role to insure that the agency's record fully and carefully develops the facts relevant to the pertinent environmental concerns. The agency's decision must be reviewed for accommodation of those concerns, based on the record.

Plaintiffs have not demonstrated that defendants have failed in their duty under NEPA. The FEIS is not deficient in suggesting FRA's failure to consider all of the environmental factors flagged by plaintiffs, nor to develop fully the record as to evidence relevant to the pertinent environmental factors, nor in its decision to allow the project to proceed with specified accommodation of those factors. Plaintiffs here assert only noncompliance with NEPA, which they have not established. The record reflects that NRA's efforts provided the decision makers with a sufficient disclosure to permit the project to proceed with a full realization of the environmental consequences, and the public to know those consequences adequately allowing full input and comment on the project. See *Trout Unlimited v. Morton,* 509 F.2d 1276, 1282–83 (9th Cir.1974).

Neither halting the project nor ordering a Supplemental Environmental Impact Statement as plaintiffs pray is warranted. Amtrak's costs and revenue loss if the project is now delayed have been amply demonstrated. Carol Affid. ¶¶ 28, 30, 31, 34. There is no genuine issue of material fact. Defendants have established their right to judgment as a matter of law. Plaintiffs have not, as a matter of law, established their right to judgment.

Accordingly plaintiffs' motion (doc. # 31) is denied, defendants' motion (doc. # 37) is granted. Judgment shall enter for defendants.

SO ORDERED.